2715 from the Northern District of Iowa, United States v. Alberto Quinto-Pascual. All right. Mr. Wasmer. Thank you, Your Honor. Ms. Williams. May it please the court. I'm Webb Wasmer. I represent Alberto Quinto-Pascal, the appellant in this matter. The issue before the court is whether or not the district court clearly erred in finding that Mr. Quinto-Pascal had shot AF as opposed to AF accidentally shooting himself. The district court had noted that this was a close case and may not have reached the same conclusion if the government's burden was proved beyond a reasonable doubt instead of by a preponderance of the evidence. As we discussed in the brief, the district court misconstrued several aspects of the evidence which renders the district court's ultimate conclusion clearly erroneous. Some of the district court's findings are not supported by substantial evidence, which leads to a definite and firm conviction that a mistake was committed. I'm not going to have time this morning to talk about all of the issues that are raised in the brief, but I wanted to focus on a couple of those issues. I think most importantly is the physical evidence, particularly the testimony of Dr. Ferchow, the pathologist who performed the which is basically how far away from the entrance wound is the firearm. He determined that he could not determine that was indeterminate as to range of fire. Typically there are three range of fires that are used. There's close contact where the gun is in physical contact with the head or very, very short distance, just a couple of centimeters. Intermediate where the gun is near but not in contact and distant two to three feet away. Thus intermediate can be anywhere from a couple of centimeters to a couple of feet. And Dr. Ferchow testified about the different features of the wound that can happen with close intermediate or distant range of fire. And I think one of the district court's main errors on this issue was finding that the material around at the wound entrance was bullet wipe not soot. Soot's deposited according to Dr. Ferchow when the gun is up to 20 to 30 centimeters from the skin. It is not deposited when the gun is further away. That would suggest more of an intermediate type of positioning for the gun. He found the, Dr. Ferchow found the material around the wound was compatible with soot. He looked at that microscope and found it to be carbonaceous material or some product of combustion that would be compatible with soot. There was no principled basis in the evidence for the district court to reject Dr. Ferchow's conclusion that the material was likely soot, which would indicate a range of fire of 20 to 30 centimeters or less. And I'd note that a foot is about 30 centimeters, just a little over 37 meters. A couple of the other physical evidence findings that the district court erred with respect to is the district court essentially did a thought experiment as to how AF might have held the gun and basically came to a speculative conclusion. The district court I think ignored the point that the shooting here was accidental, not intentional. An accidental shooting increases the possible ways in which a gun was held. I'd also like to ask the of the gun. It's a fairly small gun, so we're not talking about a massive gun here that where if you held that the barrel would have to be much closer to the head. And I think it's certainly possible to hold this gun in a way to that for AF to have held this gun in a way that he could have shot himself. Also, the district court essentially turned itself into a firearms expert without any showing that the district court was qualified as an expert to challenge Mr. Quinto Pascal's testimony about the ejection mechanism of the gun not working properly. There was a witness, Investigator Whippert, who did qualify firearms expert. However, he gave no testimony regarding the ejection mechanism and had not tested or examined the ejection mechanism. Investigator Whippert also testified that the gun was in poor condition and operated inconsistently. Those are kind of the main points regarding the physical evidence that I wanted to to emphasize here. The district court also looked at some of the inconsistencies and issues with respect to Mr. Quinto Pascal's testimony at the sentencing. Mr. Quinto Pascal testified in his own defense. And I think most importantly there, the district court found some inconsistencies in the timeline. But what the district court missed is that there are constraints on the timeline. There was a video from Ito's bar where AF and Mr. Quinto Pascal had been before the shooting that showed them there for a couple of hours talking and doing other activities and then leaving the bar. And that, while there's some question in the record as to the exact times based on some inconsistencies in that video as to how it recorded time, it does provide a starting point for when what happens next occurs. The ending point is the time of the 9-1-1 call when Mr. Quinto Pascal calls 9-1-1. And so that is a more definite time. There's also some neighbor surveillance video that time that Mr. Quinto Pascal was outside of Ms. Chisholm's home. However, whether or not Mr. Quinto Pascal shot AF or AF shot himself, either event had to occur within that time frame. So really the time frame does not make a significant difference to whether or not Mr. Quinto Pascal shot AF or whether or not AF shot himself. There was really no evidence that one possibility would have taken a shorter time than the other. Also, the district court found that Mr. Quinto Pascal would not been truthful about how the gun got under the car out in the alley. Mr. Quinto Pascal testified that he initially threw it under the car and then used his hand to push it, but that was somewhat inconsistent with his statements to the police that he had just thrown it under the car. But his testimony at trial under oath was consistent with the district court's that the gun had been placed under the car, along with his testimony that he had pushed it under the car. I would like to reserve the rest of my time for rebuttal, your honors. All right. Thank you, Mr. Wesmer. Ms. Williams. Thank you, your honors. Lisa Williams appearing on behalf of the United States from the Northern record that were made during Mr. Wesmer's state argument. First of all, I think it's important to clear up that Dr. Farouchi did not conclude that the substance that he located during the autopsy exam was in fact a bullet, was in fact a bullet wound, and that he did not determine if it was soot or if it was bullet white. And while typically that substance is consistent with bullet soot, what concerned Dr. Farouchi is that the substance was not just at the entrance room, but that it was pulled through the entire skull, through the base of the entrance room, was on the right side of the skull. And because of the remarkably long path of travel of this material, that was actually inconsistent with a finding of soot. And instead what it was more consistent with is a finding of a bullet white, that there was some dirt or debris or other matter that was attached to the bullet at the time that it went through the barrel of the gun and made impact with the victim's head. That's significant also because the only real finding that Dr. Farouchi made of this being any type of close shooting was that bullet soot or bullet white. The rest of the pathological determinations that he made pretty much excluded a contact shooting and instead suggested that the shooting was some inches away from the skull. He did not find any radiating lacerations. He did not find any buzzle imprint or searing marks. He did not find any stippling or unburnt gunpowder. And so really the only pathological characteristic of the gunshot boom that suggested that it was at all a close contact shooting was this soot and or white. And he didn't even know, frankly, he couldn't testify what it was. And that's why he reached the conclusion that it was an indeterminate range of fire. The other significant part about Dr. Farouchi is he made a pathological determination regarding the range of fire, meaning that the only evidence that he looked at was the pathological characteristics of the victim that he noted during the autopsy exam. He doesn't look at, for example, how dirty the gun was when police recovered it. He doesn't look at cooperator statements or eyewitness testimony. He is limited to that pathological determination. The District Court has no such limitations on. Of course, the District Court can consider the totality of all of the evidence, certainly the pathological findings that Dr. Farouchi looked at, but the District Court also and did consider the condition that the gun was in when it was found by law enforcement, the statements that the defendant made to police, as well as his testimony, and the statements that the witnesses who were incarcerated with the defendant said, the jailhouse confessions. And so the District Court is allowed to and did consider the whole evidence in the case. And that's how the District Court reached its conclusion. Dr. Farouchi was much more confined in what he's going to look at to make a pathological determination regarding the range of fire. And so that's why the court didn't err and its findings weren't inconsistent when it made the determination that this was a second-degree killing and not an Do not believe that the District Court ignored that it could be accidental. The District Court, and this is on page three of its opinion, the District Court says parties and evidence left the court with two possibilities. The victim accidentally shot himself or defendant intentionally shot the victim. So there's there's simply no argument that the District Court ignored the fact that this could be an accidental shooting. The District Court specifically considered it and then rejected it because the preponderance of the evidence was in fact that the defendant committed a second-degree murder. There was also some talk of there was no testimony regarding the ejection method, that the court was the only one that looked at the ejection method of the revolver to determine whether or not it was an accidental shooting or not. And I would also want to correct the record on that. While investigator Lippert didn't specifically test the ejection method himself, he did testify that that firearm was sent to the DCI lab and that at least five rounds were test-fired from the firearm at the DCI lab. And during that test firing process, no one noted anything difficult or problematic about the ejection mechanism. The judge said that he personally examined the gun and concluded that there was no problem with it. Didn't he say that in his order? He did, Your Honor. You are correct about that. I thought that was the defense point that there's no basis to think he's qualified to make that judgment. That was the argument. Well, and the point that I'm making is the judge also had the DCI lab evidence. I hear you're saying that. So you're not you're not defending the judge's qualifications to do it himself? I am not, Your Honor. I don't think, I think that a lot of the examination that the district court did did not rise to the I think that and the photos of the firearm are also with the circuit. Those are exhibit 13A. I think a lot of it is just looking at the gun, making common sense inferences from evidence that's right in front of you. And I don't think that that is the district court judge converting themselves into the role of an expert. I also wanted to just add by addressing the credibility argument, uh, that the court, I actually thought, did a pretty detailed job of, um, listing in its opinion, the credibility issues and the reason that it didn't find defendant credible. We can put aside all of the conflicting stories that the defendant, um, told law enforcement the night of the shooting and then the conflicting testimony that he gave that was not the same as his, uh, statements at night. But the district court also made specific note of all of those characteristics that are really hard to get captured for the record that the which he testified, his behavior, his long pauses after I would ask questions, he continually looked at the, at the bench to see, I think the district court said how his story was, was going over. Um, that's, that's a very significant credibility finding, um, that is very difficult to attack on appeal. Um, this is a district court who considered it, found it not credible, rejected it, and then looked at the rest of the evidence that was remaining and found that the established a second degree murder. Uh, and I apologize. I want to circle back one more time to the pathological findings. The reason why it's really important that the gun is not directly up against the victim's head is that investigator Lippert did an in-court demonstration, uh, based on the victim's height and weight and the, um, entrance wound location, as well as its of the manner in which the victim would have had to hold the firearm. Uh, it's tough again to capture that in-court demonstration on the record, but it is at the sentencing transcript 153 and 154. And basically what investigator Lippert said is the farther away the gun is from the skull at the time of discharge, the more and more unnatural and uncomfortable the victim's hand and arm and shoulder. Um, and so the farther away the gun is, the less likely it becomes that this is an accidental shooting because the, uh, way that the victim would have to contort his body to produce a shooting in this manner, it just becomes more and more unlikely. Um, so it's not that the government was arguing that this, the only outcome could be suicide. The farther away the barrel is from the head makes it more likely that, uh, the defendant was the shooter instead of this contorted, uh, accidental or self-inflicted gunshot wound. Um, if there are no other questions for the panel, I think I'm almost out of time and I would rest on the, uh, I'd rely on the rest of the government's briefing. Thank you. Thank you, Ms. Williams. Mr. Wasmer. Thank you, your honor. A few comments. Uh, first, uh, bullet wipe and soot are not mutually exclusive. Uh, you can have both. A bullet wipe is what occurs when you have a dirty barrel of the gun essentially, and the bullet picks up material as it passes through and then the bullet deposits that material in the wound. Uh, soot is a product of the combustion from the gunpowder, uh, as the gun is fired. The reason you don't get soot more than 20 or 30 centimeters away is it only travels a limited distance. So if you have the gun further away, uh, you would not have soot deposited. And that's one of the ways that they distinguish between an intermediate and a distance shooting. Uh, there was testimony from investigator Whippert here that the gun was in poor condition. Uh, he didn't specifically testify about the cleanliness of the gun. Uh, but there is some suggestion there that if the gun's in poor condition, it might have also been dirty. Um, and there isn't a whole lot of difference between a contact and a short intermediate distance. The contact is when the gun is pressed against the head or within a centimeter or two. The intermediate distance is a little further out up to a couple of feet away. Um, with regard to the ejection mechanism, uh, Mr. Quinto Pascal testified that the ejection mechanism problem was intermittent. It didn't always happen when you tried to eject bullets from the gun. It happens sometimes. And as far as we know from the DCI, uh, they basically test fired, I think, five shots from their report. Uh, they did not indicate that there was a problem with the ejection mechanism, but it also doesn't indicate that they were really looking at the ejection mechanism. And if the problem was intermittent, it may not have occurred in that, uh, brief test firing by, uh, the DCI. Uh, with regard to how AF could have been holding the gun, I think it's important to note, and this is hard to get into the record here because you don't have a video of what investigator Lippert was doing. But investigator Lippert was essentially holding the gun in an upright position when he did his demonstration. Uh, and I would agree that sometimes you get further away, that's more awkward. But if you hold the gun upside down or sideways, you can get your arm further back and you don't have to get it all that far back to have an intermediate range of fire. And as I noted before, when the court looks at exhibit 13A, this is a fairly small gun. Um, so you can get distance, uh, between the gun and AF's head that would be consistent with an intermediate range of fire and the deposit of soot. And Dr. Furchow did essentially testify, as I understand his testimony, that it was compatible that what materially found was soot. Uh, so with that, it looks like I'm out of time. So unless there's any questions, uh, we would just ask the court to reverse and remand for resentencing. Thank you, Mr. Wasmer. Thank you also, Ms. Williams. Court appreciates both participation and argument this morning. And, uh, Mr. Wasmer, we note that you have, uh, uh, represented your client under the Criminal Justice Act and thank you for your willingness to participate in our program. All right. Madam Clerk, I believe.